**Opinion issued September 29, 2016**



In The

# Court of Appeals

For The

## First District of Texas

————————————

### NO. 01-15-01037-CR

————————————

**JAMES KIRK EDMONDSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 174th District Court
Harris County, Texas
Trial Court Case No. 1390554

## MEMORANDUM OPINION

Appellant, James Edmondson, was found guilty by a jury of the offense of indecency with a child.[1] The jury assessed Appellant's punishment as nine years in

---

[1] *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011).

prison.  In one issue on appeal, Appellant contends that the evidence was not sufficient to support the judgment of conviction.

We affirm.

## Background

K.L., the complainant in this case, was born in 2001.  Her brother, D.L., was born in 2002.  The children never knew their biological father.  In 2007, the children's mother ("Mother") married Appellant.  That same year, Mother and Appellant had a son, B.E.

Appellant, Mother, K.L., D.L., and B.E. lived together in a home in Katy, Texas.  For Christmas 2008, the family bought a Wii gaming system.  The children and Appellant were playing with the Wii in the living room, when Appellant told K.L. to sit next to him on the sofa.  Appellant placed a blanket over himself and then seven-year-old K.L. and began rubbing K.L.'s legs and arms.  This made K.L. feel uncomfortable, but, because she had never had a father figure, she thought it was normal behavior.

After the incident on the sofa, Appellant began calling K.L. into the master bedroom while Mother was at work.  Each time, Appellant would tell K.L. to come to the bedroom because he needed to talk to her.  At the same time, Appellant would tell D.L. and B.E. to stay in their bedroom or to play outside.  Once in the

bedroom, Appellant would have K.L. lie face up on the bed. Appellant would then touch K.L.'s genitals and breasts over and under her clothes.

Appellant would also lie on top of K.L. She later described how Appellant would "grind on" her, moving back and forth. K.L. could feel that Appellant's penis was hard when he rubbed it against her. Appellant also made K.L. lie on top of him, telling her to thrust her hips. Appellant kissed K.L. on the lips and put his tongue in her mouth. He told K.L. that it felt good and that he loved her. Appellant threatened K.L. that, if she ever told anyone, he would hurt Mother. K.L. believed Appellant's threat.

The molestation continued until 2011 when K.L. was 10 years old. In May 2011, Mother and Appellant divorced. Mother, K.L., D.L., and B.E. moved out of the Katy home. Mother remarried in 2012, and K.L., D.L., B.E., Mother, and Mother's new husband lived together in a house in Deer Park.

In 2013, when K.L. was 12 years old, Mother gave K.L. a notebook to use as a journal to write down her thoughts and feelings. On March 29, 2013, Mother opened K.L.'s journal and saw that K.L. had written that she had been molested. The journal entry did not say who had molested K.L.

Mother immediately approached K.L. with the notebook. When she realized that Mother had seen her journal, K.L. began to shake and cry. She was afraid that Appellant would hurt her or her family if he found she had told about the abuse.

3

When Mother asked her who had molested her, K.L. disclosed that it was Appellant. Mother called the police and reported the sexual abuse.

K.L. was referred to the Children's Assessment Center where she spoke with E. Castro, a forensic interviewer. K.L. was tearful during the interview, describing multiple instances of sexual abuse. Although she was forthcoming with Castro, K.L. appeared embarrassed, at times, speaking in a whisper. Castro noted that K.L. was consistent in what she said and that she was able to provide sensory details of the abuse.

On April 13, 2013, K.L. was examined by a medical doctor, Dr. R. Isaac, at the Children's Assessment Center. The examination consisted of two parts: a patient history and a physical examination. Dr. Isaac obtained K.L.'s history from Mother. Mother told the doctor that K.L. had lost 10 pounds over the past month. She stated that K.L. had been having nightmares and trouble sleeping. Mother also reported that K.L. had been withdrawn and prone to angry outbursts. Mother indicated that K.L. had expressed thoughts of hanging herself in 2011. Mother further reported that K.L. had engaged in "self-mutilation," such as cutting herself.

Dr. Isaac also spoke to K.L. regarding her medical history, including the basis for the exam. K.L. told Dr. Isaac that Appellant had started touching her inappropriately by stroking her legs. She disclosed that, after that, Appellant began taking her into his bedroom where he would touch her vagina under her clothes.

K.L. denied that Appellant had ever penetrated her vagina. K.L. indicated to Dr. Isaac that Appellant had touched her more than 20 times. She said that Appellant would touch her when Mother went to work in the evening Mondays through Thursdays. K.L. also reported that, after she made the outcry to Mother, "a lot of scary thoughts" had returned to her. She told the doctor that she was afraid that Appellant would hurt her because she had told about the abuse.

After obtaining K.L.'s history, Dr. Isaac performed a physical examination. The examination of K.L.'s genital area was normal with no signs of trauma. At trial, Dr. Isaac indicated that it is not uncommon for an exam to be normal when the abuse involves touching, rather than penetration, and when disclosure of the abuse was delayed as here.

In June 2013, K.L. began treatment with a licensed professional counselor, S. Ecord. Ecord diagnosed K.L. with post-traumatic stress disorder, known as PTSD. During therapy, K.L. expressed to Ecord that she felt dirty and ugly, and she was disgusted with herself. Ecord learned that K.L. was having nightmares and sleep disturbances. Ecord also observed visible scratch marks on K.L.'s arms, indicating to Ecord that K.L. had engaged in self-injurious behavior. Ecord later testified that self-deprecatory comments, sleep disturbances, and self-injurious behavior are all symptoms of PTSD and that PTSD may result from sexual abuse.

5

Appellant was indicted for the offense of indecency with a child. The indictment charged that Appellant had, "on or about June 1, 2010, . . . unlawfully[] engage[d] in sexual contact with [K.L.], a child under the age of seventeen years and not the spouse of [Appellant], by touching the genitals of [K.L.] with the intent to arouse and gratify [his] sexual desire . . . ."

The case was tried to a jury in November 2015. K.L., who was then 15 years old, testified during the guilt-innocence phase. In her testimony, K.L. told the jury that Appellant first touched her inappropriately in 2008 by stroking her leg while they were playing with the Wii. She stated that, after that, Appellant began calling her into his bedroom while Mother was at work. Appellant would instruct her two brothers to stay in their room or to play outside. K.L. described how Appellant would have her lie face up on the bed. She stated that Appellant would rub her vagina and her breasts with his hands both over and under her clothes. K.L. testified that Appellant would move his hand in a circular motion when rubbing her vagina.

K.L. also testified that Appellant "would get on top of me and grind on me or put me on top of him and thrust my hips back and forth." The State asked, "When you would move back and forth at his direction, what part of your body were you moving back and forth?" She responded, "My vagina."

K.L. testified that, when Appellant would lie on top of her, she recalled "feeling his penis on me, but it never came close to penetrating me." K.L. also testified that, when he was on top of her, Appellant's penis felt hard. The State asked K.L. on what part of her body K.L. would feel Appellant's penis when he was grinding on top of her. K.L. replied, "My vagina," but K.L. made clear that K.L.'s penis never penetrated her.

K.L. also testified that Appellant would kiss her on the lips and place his tongue in her mouth. While he was touching K.L., Appellant would tell her that he loved her and that it "felt good." K.L. testified that the abuse would happen "[w]henever my mother was gone" and that her mother worked every week night and sometimes on the weekends. K.L. testified that after Appellant would tell her he was finished, she would go to her bedroom.

K.L.'s brother, D.L. also testified at trial. He recalled that "[m]ost of the time when my mom left for work" Appellant would call K.L. into the master bedroom with him. Appellant would then instruct D.L. and B.E. to stay in their room. D.L. stated that, when K.L. was in the bedroom with Appellant, the door would be closed. D.L. recalled that, when K.L. would come out of the bedroom, she would not talk. She "would just head straight to her room."

Besides K.L., the State offered the testimony of Mother; Dr. Isaac; the Child Assessment Center's forensic interviewer, E. Castro; and K.L.'s therapist, S. Ecor.

Also admitted into evidence were the medical records from the exam performed by Dr. Isaac and K.L.'s journal in which she revealed that she had been molested.

To show that the allegations against him had been fabricated, Appellant did not seek to directly discredit K.L.; rather, Appellant sought to discredit Mother to whom K.L. had made her outcry. To accomplish this, Appellant offered the testimony of a number of witnesses, including Appellant's current wife, another ex-wife of Appellant, Appellant's mother, and his step-father, who each testified that Mother had a reputation for being untruthful.

After hearing the evidence, the jury found Appellant guilty of the offense of indecency with a child as charged in the indictment. It assessed Appellant's punishment at nine years in prison. This appeal followed.

## Sufficiency of the Evidence

In his sole issue, Appellant asserts that the evidence is not sufficient to support the judgment of conviction.

### A. Standard of Review

We review the sufficiency of the evidence establishing the elements of a criminal offense for which the State has the burden of proof under a single standard of review. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013) (citing *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010)). This standard of review is the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307,

8

319, 99 S. Ct. 2781, 2789 (1979).  *See Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

Pursuant to the *Jackson* standard, evidence is insufficient to support a conviction if, considering all the record evidence in the light most favorable to the verdict, no rational fact finder could have found that each essential element of the charged offense was proven beyond a reasonable doubt.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *In re Winship*, 397 U.S. 358, 361, 90 S. Ct. 1068, 1071 (1970); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  We can hold evidence to be insufficient under the *Jackson* standard in two circumstances: (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt.  *See Jackson*, 443 U.S. at 314, 318 & n.11, 320, 99 S. Ct. at 2786, 2789 n.11; *see also Laster*, 275 S.W.3d at 518; *Williams*, 235 S.W.3d at 750.

The sufficiency-of-the-evidence standard gives full play to the responsibility of the fact finder to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  An appellate court presumes that the fact finder resolved any conflicts

in the evidence in favor of the verdict and defers to that resolution, provided that the resolution is rational. *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793.

In our review of the record, direct and circumstantial evidence are treated equally; circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Clayton*, 235 S.W.3d at 778. Finally, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

## B.     Elements of the Offense

A person commits the offense of indecency with a child by engaging in sexual contact with a child younger than seventeen. TEX. PENAL CODE ANN. § 21.11(a)(1) (Vernon 2011). "Sexual contact" includes "any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child" with the intent to arouse or gratify the sexual desire of any person. *Id.* § 21.11(c)(1).

## C.     Analysis

A complainant's testimony, standing alone, is sufficient to support his conviction of the offense of aggravated sexual assault. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a) (Vernon Supp. 2015); *Garcia v. State*, 563 S.W.2d 925,

928 (Tex. Crim. App. [Panel Op.] 1978). Here, K.L.'s testimony by itself was sufficient to prove, beyond a reasonable doubt, each element of the offense of indecency with a child. K.L. testified that Appellant, on many occasions while Mother was at work, had her lie on his bed and would touch the outside of her vagina and her breasts both over and under her clothes.

K.L.'s testimony was also supported by other evidence. Consistent with K.L.'s testimony, D.L. recalled that Appellant would tell him and B.E. to stay in their room when Appellant took K.L. into his bedroom. D.L. testified that K.L. would stay in the master bedroom with Appellant with the door closed. When she would come out, K.L. would not say anything, but would go directly to her room. In addition, the forensic interviewer testified that K.L. was consistent throughout the interview with regard to recounting the sensory details of the abuse. And, the testimony of K.L.'s therapist indicated that the behavioral issues that K.L. had been experiencing were consistent with someone who had been sexually abused.

On appeal, Appellant asserts that the evidence was insufficient to support his conviction because "[t]here is not enough evidence in this record from which a reasonable inference can be made to support that any of the testified contact Appellant had with K.L. was to gratify his own sexual desires." We disagree.

"[T]he requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all

11

surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981); *accord Bazanes v. State*, 310 S.W.3d 32, 40 (Tex. App.—Fort Worth 2010, pet. ref'd). Intent can be inferred from conduct alone, and no oral expression of intent or visible evidence of sexual arousal is necessary. *Tienda v. State*, 479 S.W.3d 863, 873 (Tex. App.—Eastland 2015, no pet.); *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd).

Here, Appellant's intent to arouse or to gratify his sexual desire could have reasonably been inferred from the evidence showing the sexual nature of the other acts engaged in by Appellant while he was touching K.L.'s vagina:

- Appellant made K.L. lie on his bed where he then touched her.

- Appellant rubbed K.L.'s vagina in a circular motion.

- Appellant laid on top of K.L. and, in a grinding motion, rubbed his penis on K.L.'s vagina.

- Appellant's penis was "hard" when he was rubbing it on K.L.'s vagina.

- Appellant forced K.L. to lie on top of him and thrust her hips.

- Appellant kissed K.L. on the lips and put his tongue in her mouth.

- While he was touching K.L., Appellant told her that it "felt good" and that he loved her.

In addition, the evidence showing that Appellant took steps to keep the activities secret further supports a finding that Appellant intended to arouse and to

gratify his sexual desire when he touched K.L.'s vagina. The evidence showed that Appellant touched K.L. only when Mother was not home, he told his sons to stay in their room or to play outside while he was with K.L. in the bedroom, and he told K.L. that he would hurt Mother if K.L. told anyone. *See Gregory v. State*, 56 S.W.3d 164, 172 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd) ("That appellant instructed the children not to reveal the events to anyone shows a consciousness of wrongdoing, which, in turn, leads to an inference that when he touched or exposed himself to children as he did, appellant harbored a specific intent to arouse and gratify his own sexual desire.").

In his brief, Appellant argues that the evidence was also insufficient to support his conviction because he presented evidence showing that Mother had a reputation for untruthfulness. Appellant intimates that Mother instigated a fabrication of the sexual-abuse claims as a means to remove Appellant from the life of their son, B.E. Appellant indicates that Mother's testimony was important to the State's case because she was the outcry witness, she testified that K.L.'s behavior changed after the outcry, and she provided information to Dr. Isaac regarding K.L.'s medical history. However, the record shows that there was other, stronger evidence of Appellant's guilt independent of Mother's testimony. Specifically, as discussed, K.L.'s testimony fully supported the jury's guilty finding. In addition, the record shows that, not only did Dr. Isaac speak to Mother

when performing the examination, she also spoke to K.L. with regard to the sexual abuse. Furthermore, K.L. and her therapist each provided testimony regarding K.L.'s post-outcry behavior, including the therapist's observations that K.L. had engaged in self injury and K.L.'s testimony that she had tried to commit suicide three times.

Appellant also points to discrepancies between Mother's testimony and K.L.'s testimony regarding the details surrounding K.L.'s outcry to Mother. To the extent that Appellant's arguments focus on Mother's credibility or on the consistency of the evidence, the jury was the sole judge of the credibility of the witnesses at trial, and we defer to the responsibility of the fact finder to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Williams*, 235 S.W.3d at 750; *see also Cain v. State*, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997) ("What weight to give contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor.). In short, we do not sit as the thirteenth juror and may not substitute our judgment for that of the jury by re-evaluating the weight and credibility of the evidence. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Viewing the evidence in the light most favorable to the verdict, we conclude a rational fact finder could have found, beyond a reasonable doubt, each element

necessary to support the finding that Appellant committed the offense of indecency with a child. Accordingly, we hold that the evidence was sufficient to support the judgment of conviction.

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Chief Justice Radack and Justices Higley and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).